```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/10/10
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BILLION TOWER INTERNATIONAL, LLC,            :            REPORT AND
                                             :            RECOMMENDATION
                        Plaintiff,           :            08 Civ. 4185 (LAK) (JLC)
                                             :
            -v-                              :            (ECF Case)
                                             :
MDCT CORPORATION,                            :
                                             :
                        Defendant.           :
------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge**

**To the Honorable Lewis A. Kaplan, United States District Judge:**

On  May 19, 2009, the Court granted the motion of plaintiff Billion Tower International,

LLC ("Billion Tower" or "Plaintiff") for a default judgment against defendant MDCT

Corporation ("MDCT" or "Defendant").  The Court then referred the matter for an inquest to

determine damages.  (Doc. 37).  Billion Tower filed papers in support of its claim for damages

on August 14, 2009 and, following a request for additional information, on April 16, 2010. (See

Docs. 42, 43, 48, 49).  The deadline for MDCT to submit opposition papers passed without

response on May 7, 2010.  (See Order, dated March 15, 2010 (Doc. 47)).

For the reasons stated below, I recommend that the Court enter judgment for Billion

Tower against MDCT in the amount of $111,507.50 in damages plus pre-judgment interest at a

rate of nine percent per annum calculated by the Clerk of the Court as set forth in Part III.C infra.

1

## I.    Background

Billion Tower is a limited liability company organized in New Jersey with its primary place of business located in New York, New York. (Amended Complaint ("Am. Compl.") ¶ 4 (Doc. 3)). It is a wholesale distributor of name-brand clothing and other products. (Affidavit of Joeson Ko, dated August 14, 2009 ("Ko Aff.") ¶ 1 (Doc. 42)). MDCT is a California corporation. (Am. Compl. ¶ 5 (Doc. 3)).

On September 28, 2007, a representative of MDCT, Andrew Kha, met with representatives of Billion Tower in New York City to discuss a possible clothing production agreement. (Id. ¶ 12). At this meeting, Mr. Kha showed samples of MDCT's products and discussed MDCT's production capabilities in Vietnam. (Id.). Billion Tower was particularly interested in Vietnamese manufacturers because it already had relationships with certain Chinese manufacturers and did not want to contract with any others in China. (Id. ¶ 17). Billion Tower also required timely delivery of its goods to avoid charge-backs or mark-down allowances given to Billion Tower's retail customers whose shipments were late.[1] (Id. ¶ 16). After being assured by Mr. Kha that MDCT would meet these requirements, Billion Tower entered into a contract with MDCT requiring MDCT to produce 115,654 articles of clothing at a cost of $651,085.82. (Id. ¶¶ 15, 19).

---

[1] Billion Tower retail customers receiving incomplete or defective clothing shipments are allowed to "charge-back," or to take a mark-down allowance from, Billion Tower as compensation. (Supplemental Affidavit of Joeson Ko, dated April 16, 2010 ("Ko Supp. Aff.") ¶¶ 36-37 (Doc. 47)). Billion Tower engages The CIT Group/Commercial Services, Inc. ("CIT") to pay it for its accounts receivable and collect payments directly from Billion Tower's retail customers. (Ko Aff. ¶ 33 (Doc. 42)). These "charge-backs" or "mark-down allowances" are reflected in the statements that Billion Tower receives from CIT. (Id.).

MDCT later agreed to deliver pre-production samples of the clothing to Billion Tower by November 2, 2007, but it failed to do so. (Id. ¶ 20). On November 2, 2007, Billion Tower contacted MDCT about the status of the pre-production samples and MDCT's preparations for manufacturing the products at the Vietnam factory. (Id. ¶ 21). A few days later, MDCT told Billion Tower that it had shifted manufacturing to China. (Id. ¶ 22). Billion Tower subsequently experienced several delays by MDCT to produce and ship the ordered clothing. (Id. ¶¶ 24-27).

In anticipation of MDCT's performance of the contract, Billion Tower incurred certain costs. First, on or around January 25, 2008, it placed an order with a Chinese company, Shanghai Limited Trading Company, to manufacture price tags for the MDCT-produced clothing. (Ko Aff. ¶ 28, Ex. 2 (Doc. 42)). On or around January 29, 2008, it placed a separate order with a Chinese company, Plastic Making Limited Company, to manufacture clothing hangers for the MDCT-produced clothing. (Id.). As proof of these purchases, Billion Tower has submitted receipts from the two companies. (Id.). Each of the receipts is in Mandarin; however, they are dated in English. (Id.). According to a spreadsheet produced by Billion Tower, it spent $14,556.16 for the hangers and $737.76 for the price tags. (Id.).

Next, on April 11, 2008, Billion Tower paid MDCT $5,410.81 in exchange for a shipment of clothing that it received from MDCT. (Ko Aff. ¶¶ 22-24, Ex. 1) (Doc. 42)). The shipment of clothing was late and constituted less than five percent of the total goods that MDCT was obligated to provide to Billion Tower. (Ko Supp. Aff. ¶¶ 12, 21 (Doc. 47)). This was the only shipment of clothing that MDCT provided to Billion Tower. (Id.).

Finally, due to MDCT's late and failed deliveries of the clothing MDCT was obligated to provide to Billion Tower, between February and May 2008, Billion Tower incurred charge-backs

3

and mark-down allowances from its retail customers in an amount totaling $111,507.50.  (Ko Aff. ¶¶ 31-41, Exs. 3-8 (Doc. 42)).

## II.    Procedural History

Billion Tower filed a Complaint on May 1, 2008 and an Amended Complaint on May 14, 2008.  (Docs. 1, 3).   MDCT filed its Answer with counterclaims on July 22, 2008.  (Doc. 7).

On November 6, 2008, Billion Tower and MDCT entered into an oral settlement agreement after a court-ordered mediation session the parties participated in that day. (Supplemental Declaration of Brian P. Galligan, dated April 16, 2010 ("Galligan Supp. Decl.") ¶ 12).  On December 19, 2008, Billion Tower requested that the Court refer the case to Magistrate Judge Eaton for settlement because of MDCT's "attempt to back out of [the] settlement" reached by the parties.  (Letter, dated December 9, 2008 from Brian Galligan to Hon. Lewis A. Kaplan). On December 24, 2008, the Court referred the case to Magistrate Judge Eaton for settlement. (Doc. 17).  Billion Tower subsequently filed a Motion to Enforce the Settlement Agreement on January 29, 2009.  (Docs. 22-24).

A settlement conference scheduled for February 6, 2009 was cancelled due to the disclosure by MDCT's counsel that she would file a motion to withdraw as attorney.  (Doc. 21). On March 3, 2009, the Court granted defense counsel's motion to withdraw as attorney and advised MDCT that, unless it retained a new attorney within thirty days, it risked having its counterclaims dismissed and having a default judgment entered against it.  (Doc. 30).

4

As MDCT failed to retain new counsel, on May 19, 2009, the Court granted a default judgment against MDCT. (Doc. 36). On May 20, 2009, the case was referred to Magistrate Judge Eaton to conduct an inquest into damages. (Doc. 37).

On June 18, 2009, Magistrate Judge Eaton issued a Scheduling Order requiring Billion Tower to submit an inquest memorandum by August 14, 2009 and MDCT to submit its opposition papers by September 11, 2009. (Doc 40). On August 14, 2009, Billion Tower filed as part of its inquest submission: (1) an Affidavit of Joeson Ko, Billion Tower's managing member, dated August 14, 2009 (Doc. 42), and (2) a Declaration of Brian P. Galligan, counsel for Billion Tower, dated August 14, 2009 ("Galligan Decl.") (Doc. 43). MDCT did not file opposition papers. Magistrate Judge Eaton retired on February 28, 2010, and the case was reassigned to me to conduct the inquest into damages on March 2, 2010. (Doc. 45). On March 15, 2010, I ordered Billion Tower to provide the Court with additional briefing regarding, among other things, the factual and legal bases for the claims in its initial inquest submission. (Doc. 46). On April 16, 2010, Billion Tower supplemented its initial submission with: (1) a Supplemental Affidavit of Joeson Ko, dated April 16, 2010 (Doc. 47); and (2) a Supplemental Declaration of Brian P. Galligan, dated April 16, 2010 (Doc. 48).

## III.    Discussion

### A.    Legal Standard

Since the Court previously entered a default judgment in this case (see Doc. 36), the only remaining issue is the amount of damages owed to Billion Tower.  In light of MDCT's default, Billion Tower's allegations, with the exception of those relating to damages, are accepted as true. See, e.g., Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009) (citing Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)); Cotton v. Slone, 4 F.3d 176, 181 (2d Cir. 1993). Billion Tower, however, bears the burden of establishing its entitlement to recovery and thus must substantiate its claim with evidence to prove the extent of its damages.  See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992) (citing Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974)).

Although the Court may hold a hearing to assess those damages, a hearing is not required where a sufficient basis on which to make a calculation exists.  See Fed. R. Civ. P. 55(b)(2); see also Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir. 1993).  Indeed, the Second Circuit has approved the holding of an inquest by affidavit, without an in-person court hearing, "'as long as [the Court has] ensured that there was a basis for the damages specified in the default judgment.'"  Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (quoting Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989)).  "Magistrate judges and district courts have interpreted this to mean that, even when the defendant defaults and is not present to object, damages must be based on admissible evidence." House v. Kent Worldwide Mach. Works, Inc., 359 Fed. App'x 206, at *1 (2d Cir. 2010) (summary order) (citations omitted).  Accordingly, I will rely on Billion Tower's affidavits in determining the reasonableness of the damages requested.  See Tamarin, 13 F.3d at 54.

6

**B.      Damages Calculation Under the Uniform Commercial Code**

As an initial matter, the Court has diversity jurisdiction under 28 U.S.C. §1332(a)(1); accordingly, New York law applies.  See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941).

New York has adopted the Uniform Commercial Code, Article 2 of which provides a comprehensive body of rules applicable to "transactions in goods . . . ." N.Y. U.C.C. § 2-102 (McKinney 2010).  The meaning of "goods" includes tangible personal property that is movable at the time it is "identifi[ed] to the contract . . . ." Id. § 2-105(1).  The contract between Billion Tower and MDCT required MDCT to provide clothing—goods—to Billion Tower. (See, e.g., Am. Compl. ¶ 19 (Doc. 3)).  The U.C.C. thus applies.

Section 2-711 of the Uniform Commercial Code provides an aggrieved buyer with a number of options where, as here, a seller fails to make delivery—the buyer may "(a) 'cover' and have damages under [Section 2-712] as to all the goods affected whether or not they have been identified to the contract; or (b) recover damages for non-delivery as provided in this Article (Section 2-713)."[1]  Additionally, both Sections 2-712 and 2-713 provide that a buyer may recover any incidental and consequential damages "less expenses saved in consequence of the seller's breach." Id. § 2-712(2), 2-713(1).

---

[1]  "On the one hand, cover may be viewed as a species of mitigation; a disappointed buyer may discharge his obligation to mitigate damages through purchasing replacement goods, and the breaching seller is liable only for the value of the promise originally made less the value of replacement, leaving aside the issue of special goods." Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 594 (S.D.N.Y. 2004) (citations omitted).  On the other hand, "cover may be viewed as a species of self-help; where the disappointed buyer must either find substitute goods or face substantial losses, the law instructs him to do the former." Id.

Incidental damages include, among other things, "any commercially reasonable charges, [or] expenses incident" to the breach, and "[c]onsequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; . . . ." Id. 2-715(1)-(2).

Incidental damages typically "provide reimbursement for the buyer who incurs reasonable expenses in connection with the handling of rightfully rejected goods or goods whose acceptance may be justifiably revoked, or in connection with effecting cover where the breach of the contract lies in non-conformity or non-delivery of the goods." Id. cmt.1. Consequential damages, the New York Court of Appeals has explained, "are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed." Kenford Co. v. County of Erie, 73 N.Y.2d 312, 321, 540 N.Y.S.2d 1, 5 (1989); see also N.Y.U.C.C. § 2-715.

Moreover, where a contract is silent on the subject of consequential damages, "the court must take a 'common sense' approach, and determine what the parties intended by considering 'the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously.'" Schonfeld v. Hillard, 218 F.3d 164, 172 (2d Cir. 2000) (quoting Kenford, 73 N.Y.2d at 319, 540 N.Y.S.2d at 4)).

8

Billion Tower first seeks damages in the amount of $147,038.46 for MDCT's breach of contract. (Galligan Supp. Decl. ¶ 3 (Doc. 48)).[2] Joeson Ko ("Ko"), Billion Tower's managing member, affirms that MDCT owes Billion Tower $147,038.46. (Ko Supp. Aff. ¶ 4 (Doc. 47)). More specifically, Ko affirms that this number represents (1) costs relating to an April 11, 2008 payment to MDCT that it should "forfeit" due to its breach of contract (Ko Aff. ¶ ¶ 22-26 (Doc. 42)); (2) out-of-pocket expenses incurred by Billion Tower for hangers and price tags for the clothing that MDCT failed to deliver (id. ¶¶ 27-30); and (3) damages relating to charge-back and mark-down allowances taken by Billion Tower's retail customers as a result of MDCT's breach (id. ¶¶ 31-43). Additionally, Billion Tower seeks lost profit damages in the amount of $770,188.24. (Id. ¶ 45). I will address each of these claims seriatim.

---

[2] Billion Tower alleges both breach of contract and fraud claims in its complaint. (Am. Compl. ¶¶ 1, 36-40 (Doc. 3)). "[W]here a fraud claim arises out of the same facts as [a] plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and [a] plaintiff's sole remedy is for breach of contract." Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d Cir. 2001).

That is exactly the case here. Indeed, the facts in the Complaint to support Billion Tower's breach of contract claim provide the basis for Billion Tower's fraud claim as well, supplemented only by the allegation that "Defendant's representations were false when stated, material to Billion Tower's decision to contract with Defendant and constituted an undisclosed intention by Defendant not to perform its contractual obligations in the manner agreed to with Billion Tower." (Am. Compl. ¶ 39 (Doc. 3)). Consequently, I will assess damages based solely on Billion Tower's breach of contract claim. See Mktg. Devs., Ltd. v. Genesis Import & Export, Inc., No. 08-CV-3168 (CBA) (CLP), 2009 WL 4929419, at *7 (E.D.N.Y. Dec. 21, 2009); Federated Retail Holdings, Inc. v. Sanidown, Inc., No. 06 Civ. 6119 (LTS) (THK), 2009 WL 2394528, at *5 (S.D.N.Y. Aug. 5, 2009) (citing Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19 (2d Cir. 1996)); TMS Entm't Ltd. v. Madison Green Entm't Sales, Inc., No. 03 Civ. 0517 (GBD) (RLE), 2005 WL 2063786, at *2 (S.D.N.Y. Aug. 16, 2005). In any event, "[a] plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery." Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995).

1.      **April 11, 2008 Payment to MDCT**

Billion Tower seeks damages in the amount of $5,410.81 based on an April 11, 2008

payment to MDCT in that amount. (Id. ¶ 22 (Doc. 42); Ko Supp. Aff. ¶ 7 (Doc. 47)).  Billion

Tower contends that MDCT should "forfeit" these payments due to MDCT's breach. (Ko Aff. ¶

22 (Doc. 42)).  Billion Tower made this payment after receiving only a portion of the goods

MDCT had agreed to provide (Ko Supp. Aff. ¶ 7 (Doc. 47)).  Billion Tower argues that it is

entitled to damages in the amount of this payment because the goods that MDCT shipped to

Billion Tower arrived late and constituted less than 5% of the total goods that MDCT was

obligated to provide. (Id. ¶¶ 12, 21).

Billion Tower is not entitled to damages for this payment.  New York's Uniform

Commercial Code § 2-601 provides, in relevant part, that "if the goods or the tender of delivery

fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept

the whole; or (c) accept any commercial unit or units and reject the rest." N.Y. U.C.C. § 2-601.[3]

Acceptance of goods occurs when the buyer, after a reasonable opportunity to inspect the goods,

---

[3] "'Commercial unit' means such a unit of goods as by commercial usage is a single
whole for purposes of sale and division of which materially impairs its character or value on the
market or in use.  A commercial unit may be a single article (as a machine) or a set of articles
(as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any
other unit treated in use or in the relevant market as a single whole." N.Y. U.C.C. § 2-105(6).
"A determination as to what constitutes a commercial unit for the purposes of [an] [a]greement
necessarily entails reference to the [a]greement itself and the prior course of dealings between
the parties." In re Crysen/Montenay Energy Co. v. Consolidated Edison co. of New York (In re
Crysen/Montenay Energy Co.), 156 B.R. 922, 926 (S.D.N.Y. 1993).  Here, it appears that the
parties contemplated that MDCT would ship the goods in multiple shipments. (See, e.g., Ko
Supp. Aff. ¶ 18 (Doc. 47) ("MDCT contacted Billion Tower and stated that the first . . . shipment
would be delivered by the end of the month.") (emphasis added)).  I will therefore treat each
shipment of clothing as a commercial unit.

signifies to the seller that the buyer will take and retain them in spite of their nonconformity, or does any act which is inconsistent with the seller's ownership. N.Y.U.C.C. § 2-606(1)(a), (c). Where a tender of goods has been accepted "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Id. § 2-607(3)(a).

Here, the evidence plainly demonstrates that Billion Tower accepted the March 2008 shipment. While the exact date is not identified, Billion Tower received the shipment sometime in March and paid for it shortly thereafter on April 11, 2008. (Ko Supp. Aff. ¶ 7 & Ex. 1). Payment after the tender of goods is one of the key indicia of acceptance of goods. N.Y. U.C.C. § 2-606, cmt. 3; see also Robert Hunt Co. v. S & R Coachworks, Inc., 215 A.D.2d 361, 625 N.Y.S.2d 662 (1st Dep't 1995) (concluding, on a motion for summary judgment, that defendants failed to effectively reject allegedly defective windows after tendering check to plaintiffs for windows). Billion Tower, moreover, provides no evidence that it notified MDCT of any non-conformity with the portion of the goods that MDCT did deliver. See N.Y.U.C.C. ¶ 2-607(3)(a). Accordingly, Billion Tower is not entitled to damages of $5,410.81 from MDCT, and Billion Tower's contention that MDCT should "forfeit" this payment is without merit.

### 2.    Out of Pocket Expenses for Hangers and Price Tags

Billion Tower next seeks consequential damages in the amount of $15,293.92—$14,556.16 for hangers and $737.76 for price tags—that Billion Tower intended to use for the clothing that MDCT failed to deliver. (Ko. Aff. ¶¶ 27-28 (Doc. 42)). In support of these damages, Billion Tower provides two receipts—one from Plastic Making Limited Company ("Plastic Limited"), the maker of the hangers, and one from Shanghai Limited Trading Company

11

("Shanghai Limited"), the maker of the price tags.  (See id. ¶ 28, Ex. 2).  The receipts are in

Mandarin (id. ¶ 28); however, each receipt is dated in English (id., Ex. 2).  The receipt from

Shanghai Limited is dated January 28, 2008; the receipt from Plastic Limited is dated January

29, 2008.  (Id.).  Additionally, Billion Tower provides a spreadsheet that Ko kept that sets forth

the total number of tags and hangers that the companies completed for the clothing MDCT

expected to receive from MDCT, and the total cost of these items.  (Id.).  One of the columns on

the spreadsheet lists retail customers such as Goody's, Boscov's, and Kohl's for whom the

hangers and tags were intended.  (Id.).

        Because Billion Tower seeks consequential damages, I must determine whether (1)

MDCT had reason to know at the time of contracting that Billion Tower would incur these

expenses, and (2) whether Billion Tower could have reasonably prevented these expenses by

cover or otherwise.  See N.Y.U.C.C. § 2-715(1)-(2); Kenford, 73 N.Y.2d at 321, 540 N.Y.S.2d at

5.  I conclude that although Billion Tower could not have reasonably prevented these expenses,

Billion Tower provides no evidence that MDCT had any reason to know that Billion Tower

would incur these expenses or that they were reasonably foreseeable.

        First, Billion Tower could not have reasonably prevented these expenses.  The evidence

demonstrates that Billion Tower did not purchase the hangers and price tags until the end of

January 2008 (Ko Aff. ¶ 29 & Ex. 2 (Doc. 42)), the same time that it was expecting to begin

receiving the shipments of clothing from MDCT (Ko Supp. Aff. ¶ 18 (Doc. 47) ("On January 3,

2008, MDCT contacted Billion Tower and stated that the first . . . shipment would be delivered

by the end of the month.")).  Although presumably Billion Tower could have waited until it

received the shipment from MDCT before ordering the hangers and price tags, this action would

not have been reasonable as it would have forced Billion Tower's customers to wait even longer for clothing that was already very late for delivery.

Regarding foreseeability, although MDCT knew that Billion Tower intended to sell the garments to retailers who would, in turn, sell them to consumers, (see Ko Aff. ¶ 15 (Doc. 42)), Billion Tower provides no evidence that MDCT had reason to know at the time of contracting that Billion Tower would purchase hangers and price tags for the garments, and provides no evidence regarding whether such actions are consistent with industry practice. Billion Tower therefore has failed to establish that it is entitled to damages for these expenses.[4]

### 3.    Charge-backs & Mark-down Allowances

Billion Tower next seeks consequential damages in the amount of $111,507.50 relating to charge-backs and mark-down allowances by its retail customers as a result of MDCT's failure to deliver the garments it was obligated to provide under the parties' agreement. (Id. ¶ 31 (Doc.

---

[4] In any event, even if Billion Tower had provided evidence that MDCT had reason to know Billion Tower would purchase the hangers and price tags, the evidence Billion Tower provides does not allow me to ascertain the amount of damages with reasonable certainty. See Transatlantic, 109 F.3d at 111. Because the receipts for the hangers and price tags are in Mandarin, I am not able to determine their contents. Billion Tower contends that the currency referenced in the receipts is the Chinese Renminbi but provides no information regarding the number of hangers and price tags it purchased in January 2008 or the total amount it paid, in Chinese Renminbi or dollars, for the items in each order. (Ko Aff. ¶ 28 n.3 (Doc. 42)). Additionally, regarding the spreadsheet, I am unable to ascertain whether the information contained in it pertains only to the hangers and price tags meant for MDCT's products. For instance, Billion Tower claims that it "contracted with [MDCT] to manufacture 115,654 units of the articles of clothing . . . at a cost of $651,085.82." (Id. ¶ 18). The quantity column of Billion Tower's spreadsheet, however, provides that it obtained 105,394 price tags and 90,976 hangers. (Id., Ex. 2.) The number of hangers and price tags thus do not match the number of units that Billion Tower expected to receive from MDCT. Billion Tower does not explain this disparity.

42)).  In support of these damages, Billion Tower provides electronic payment statements issued

by CIT that provide documentary evidence of charge-backs and mark-down allowances that were

solely the result of MDCT's failure to provide Billion Tower with all of the promised goods.  (Id.

¶ 34 & Exs. 3-8); (Ko Supp. Aff. ¶ 35 (Doc. 47)).[5]  More specifically, Billion Tower provides

documentary evidence of charge-backs and mark-down allowances from (1) Peebles Clothing

Stores in the amount of $17,000 (Ko Aff. ¶ 36 & Ex. 3 (Doc. 42)); (2) Macy's South Department

Store in the amount of $22,000 (id. ¶ 37 & Ex. 4); (3) Goody's Family Clothing Stores in the

amount of $15,000 (id. ¶ 38 & Ex. 5); (4) Kohl's Department Stores in the amount of $20,000

(id. ¶ 39 & Ex. 6); (5) Fred Meyer Stores in the amount of $14,200 (id. ¶ 40 & Ex. 7); and (6)

Boscov's Department Stores in the amount of $23,307.50 (id. ¶ 41 & Ex. 8).

As before, because these damages constitute consequential damages, Billion Tower must

establish that MDCT had reason to know at the time of contracting that these charge-backs and

mark-down allowances were reasonably foreseeable consequences of breach, and that Billion

Tower could not have reasonably prevented these expenses by cover or otherwise.  See

N.Y.U.C.C. § 2-715(1)-(2); Kenford, 73 N.Y.2d at 321, 540 N.Y.S.2d at 5.  As to these damages,

Billion Tower meets its burden.  First, Billion Tower provides evidence that, before contracting

with MDCT, it explained that "late and/or incomplete shipments by Billion Tower to its own

retail customers would result in charge-backs and mark-down allowances related to the

merchandise by said customers to Billion Tower."  (Ko Aff. ¶ 15 (Doc. 42); see also Ko Supp.

---

[5] Billion Tower retains CIT to serve as a "factoring party."  (Ko Aff. ¶ 33 (Doc. 42)).  In
this capacity, CIT pays Billion Tower for its accounts receivable and then collects payments
directly from Billion Tower's retail customers.  (Id.).  This arrangement thus provides Billion
Tower with immediate access to operational funds.  (Id.).

Aff. ¶¶ 19-20 (Doc. 47)). The charge-backs and mark-down allowances were thus reasonably foreseeable by MDCT.

Second, it is clear Billion Tower could not have reasonably prevented these expenses. The decision in Texpor Traders, Inc. v. Trust Co. Bank, 720 F. Supp. 1100, 1113-14 (S.D.N.Y. 1989) is instructive in this regard. There, the court concluded that a commercial buyer of sweatshirts intended for resale in a department store could not have reasonably prevented the consequential damages it incurred after the manufacturer of the sweatshirts sent one shipment of the goods near the parties' agreed upon deadline and another shipment late. Id. at 1114. The court reasoned, in part, that (1) the seller was aware that the goods were intended for resale and that that timely delivery of the goods was important to the buyer; (2) nevertheless, one shipment of the goods arrived very close to the buyer's commercial deadline and the other arrived late; and (3) the goods were a special order—part of a line of clothing that the buyer was attempting to develop. Id.[6]

Such is the case here as well. MDCT was aware that the goods were intended for resale and that timely delivery of the goods was important to Billion Tower (Ko Aff. ¶ 15 (Doc. 42)); a portion of the promised goods arrived over four months late (Ko Supp. Aff. ¶¶ 12, 21 (Doc. 47)); and the goods were part of a special order of clothing that MDCT manufactured specifically for Billion Tower (Ko Aff. ¶ 15 (Doc. 42)). The uniqueness of the clothing MDCT

---

[6] In Texpor Traders, the Court ultimately awarded the commercial buyer of sweatshirts lost profit damages for the loss of confirmed customer orders that the buyer proved at trial but declined to award lost profits damages for potential customer orders that it deemed "speculative" and for which "no basis exist[ed] for computing the amount of damages." Texpor Traders, 720 F. Supp. at 1114. As discussed in Part III.B.4 infra, and like the potential customer orders in Texpor Traders, the lost profit damages that Billion Tower seeks here are similarly speculative.

manufactured is particularly important, moreover, because "[s]pecific brands and styles of clothing, such as the . . . goods at issue here, are not so fungible." Jewell-Rung Agency, Inc. v. Haddad Org., Ltd., 814 F. Supp. 337, 342 (S.D.N.Y. 1993) (citation omitted) (concluding, on a motion for summary judgment, that buyer's decision not to effect cover after seller's failure to provide contracted for clothing was not unreasonable as a matter of law where, among other things, the contract provided for "branded goods, manufactured from specific patterns and specific styles"). Indeed, the clothing at issue here was to bear Billion Tower's brand names and be of specific styles. (See, e.g., Ko Supp. Aff. ¶¶ 2, 13, 25 (Doc. 47)). In light of this evidence, Billion Tower could not have reasonably prevented these expenses by effecting cover or otherwise; thus, Billion Tower is entitled to damages on these claims in the amount of $111,507.50.

### 4.   Lost Profits

Billion Tower next seeks damages in the form of lost profits in the amount of $770,188.24. (Ko Aff. ¶ 45 (Doc. 42)). In support of these damages Billion Tower directs the Court to its "lost profit summary"—a document created by Billion Tower—that contains two charts. (Affidavit of Joeson Ko in Support of Billion Tower's Motion for Default Judgment dated April 27, 2009 ("Ko DJ Aff.") ¶ 21 (Doc. 33)). One chart "sets forth the total quantity of goods ordered by each retailer, the total cost borne by Billion Tower, the total amount of sales expected to each retailer, and the total profits expected by Billion Tower if each retailer never cancelled subsequent orders as a result of MDCT's wrongful conduct." (Ko Supp. Aff. ¶ 57 (Doc. 47)). Relying on this chart, Billion Tower claims lost profits in the amount of $282,712.96. (See Ko DJ Aff. ¶ 21 (Doc. 33)). In the other chart, Billion Tower "approximated

16

the total sales and profits lost as a result of the loss of its Bon Ton Stores account (based on a

review of historical sales and profits data) . . . ." (See Galligan Supp. Decl. ¶ 16 (Doc. 48)).

Relying on this chart, Billion Tower claims lost profits in the amount of $487,475.28. (Ko DJ

Aff. ¶ 21 (Doc. 33)). Billion Tower acknowledges that it "does not possess additional

documentation regarding its lost profits analysis." (Ko Supp. Aff. ¶ 58 (Doc. 47)). For the

reasons that follow, Billion Tower is not entitled to lost profit damages.

In this context, the lost profits Billion Tower seeks constitute consequential damages.

See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 109 (2d Cir. 2007)

("Lost profits are consequential damages when, as a result of the breach, the non-breaching party

suffers loss of profits on collateral business arrangements."). Under the U.C.C.,

> [w]here, as here, the buyer seeks to recover profits lost when the seller failed to
> deliver goods that the buyer had intended to resell at a profit, the buyer must show
> that "the seller at the time of contracting had reason to know" that buyer would
> lose profits, and that the lost profits "could not be reasonably prevented by cover
> or otherwise," for instance, by purchasing substitute goods in the open market for
> resale.

Happy Dack Trading Co., Ltd. v. Agro-Indus., Inc., 602 F. Supp. 986, 994 (S.D.N.Y. 1984)

(quoting N.Y.U.C.C. § 2-715(2)(a)). Additionally, a party is entitled to recover this form of lost

profits "only if (1) it is demonstrated with certainty that the damages have been caused by the

breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is

established that the damages were fairly within the contemplation of the parties." Tractebel, 487

F.3d at 109 (citing Kenford, 67 N.Y.2d at 261, 502 N.Y.S.2d at 5); see also Ashland Mgmt. Inc.

v. Jainen, 82 N.Y.2d 395, 403-04, 604 N.Y.S.2d 912, 916 (1993).

Billion Tower provides evidence that lost profit damages were fairly within the contemplation of the parties because MDCT knew that Billion Tower would be subject to profit affecting charge-backs and mark-down allowances from its retail customers in the event of late delivery by MDCT. (Ko Supp. Aff. ¶ 11 (Doc. 47)). Indeed, MDCT knew that Billion Tower was a distributor—an entity in the business of reselling the goods MDCT manufactured. (Ko Aff. ¶ 15 (Doc. 42)). Such knowledge is sufficient to establish that lost profits were within the contemplation of the parties. See Happy Dack, 602 F. Supp. at 994; Afolabi v. Jones, No. 06 CV 2756 (RJD) (MDG), 2008 WL 4890166, at *4 (E.D.N.Y. Nov. 12, 2008) (citing Canusa Corp. v. A & R Lobosco, Inc., 986 F. Supp. 723, 732 (E.D.N.Y. 1997)); N.Y.U.C.C. § 2-715, cmt. 6 ("In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know."). Moreover, as discussed in Part III.B.3 supra, Billion Tower could not have reasonably prevented these losses by effecting cover or otherwise because the clothes MDCT was to provide to it were unique. Finally, there is no question that Billion Tower's alleged lost profits were caused directly by MDCT's breach. (Am. Compl. ¶¶ 25-28 (Doc. 3)).

Billion Tower fails to provide evidence, however, that these alleged lost profits are capable of proof with reasonable certainty. Tractebel, 487 F.3d at 109. The Second Circuit has made clear that a court "may not just accept [a party's] statement of the damages." Transatlantic, 109 F.3d at 111 (reversing district court's determination, after default judgment, that accepted at face value plaintiff's unsubstantiated estimation of damages in complaint). Yet this is essentially what Billion Tower asks the Court to do here. Billion Tower provides the Court with two charts containing projected sales, costs, and profits in support of its estimation of lost profits but fails to provide any substantiation for the numbers contained therein. (Ko DJ Aff. ¶ 21 (Doc. 33).)

18

Moreover, although Billion Tower admits that it "does not possess additional documentation regarding its lost profits analysis," (Ko Supp. Aff. ¶ 58 (Doc. 47)), it nonetheless offers that lost profits resulting from its loss of the Bon Ton Stores account was "based on a review of historical sales and profit data . . . ." (Galligan Supp. Decl. ¶ 16 (Doc. 48)).  Billion Tower does not provide this historical sales and profit data to the Court.

　　　　"Although lost profits need not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'" Schonfeld v. Hillard, 218 F.3d 164, 172 (2d Cir. 2000) (quoting Ashland, 82 N.Y.2d at 403, 604 N.Y.S.2d at 915).  Billion Tower fails to provide the Court with such known reliable factors here.  Consequently, before accepting Billion Tower's lost profit figures, the Court would be forced to make speculative, if not erroneous, assumptions, including that all projected sales, expenses, and profits provided for in Billion Tower's lost profits summary proved correct.  See Homkow v. Musika Records, Inc., No. 04 Civ. 3587 (KMW) (THK), 2009 WL 721732, at *10-12 (S.D.N.Y. Mar. 18, 2009) (concluding, in damages inquest, that plaintiff's lost profit calculations were "fundamentally flawed" where, among other things, plaintiff provided "no sound basis" for its projected sales of a CD in spite of providing affidavit from music industry expert to support plaintiff's projected sales figures and costs);  Int'l Telecom, Inc. v. Generadora Electrica Del Oriente, S.A., No. 00 Civ. 8695 (WHP) (KNF), 2004 WL 784941, at *4 (S.D.N.Y. April 13, 2004) (concluding, in damages inquest, that lost future profit calculations were insufficient where, in spite of plaintiff's "thorough" documentation, court would have to assume, among other things, all plaintiff's projected expenses would have proved correct) (citing Schonfeld, 218 F.3d at 174-75).  This the Court cannot do.

19

Finally, I note that Billion Tower contends that all of the evidence it has provided to the Court is "sufficient to substantiate [its] allegations, especially considering that MDCT has never once disputed any of Billion Tower's sworn affidavit evidence and the documentary evidence upon which such affidavits are based, . . . ." (Galligan Supp. Decl. ¶ 8 (Doc. 48)). I disagree. Although its evidence is undisputed, Billion Tower still bears the burden of establishing its entitlement to recovery. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). Billion Tower fails to meet that burden here. Moreover, each of the cases that Billion Tower cites in support of this proposition is inapposite. (See Galligan Supp. Aff. ¶ 8). First, neither R-T Leasing Corporation v. Ethyl Corporation, 494 F. Supp. 1128, 1137 (S.D.N.Y. 1980), nor Woodward & Dickerson v. Kahn, No. 89 Civ. 6733 (PKL), 1993 WL 106129, at *2 (S.D.N.Y. April 2, 1993) involved an inquest by affidavit. Second, the language Billion Tower quotes from Marketing Developments, Ltd. v. Genesis Import and Export, No. 08-CV-3168 (CBA) (CLP), 2009 WL 4929419, at *12 (E.D.N.Y. Dec. 21, 2009) and O.T.S. Logistics, Inc. v. Maestri Pastai, Inc., No. 09-CV-1406 (NGG) (CLP), 2010 WL 772745, at *5 (S.D.N.Y. Mar. 4, 2010) is merely from each court's concluding paragraph, contains no legal analysis, and provides no support for Billion Tower's position. Finally, ATC Healthcare Services, Inc. v. Personnel Solutions, Inc., No. 01 CV 762 CBA, 2006 WL 3758618, at *8 (E.D.N.Y. Dec. 19, 2006), actually undermines Billion Tower's argument as in that case the court correctly stated that lost profits must be ascertained with reasonable certainty and ultimately concluded that the plaintiff in the case failed to provide sufficient evidence to meet that standard. See id. at *12 (reasoning that "plaintiff has failed to submit documentation estimating . . . lost profits with reasonable certainty" where documentation was based on unduly speculative estimations).

20

For all these reasons, Billion Tower should not be awarded lost profit damages.

## C.    Pre-Judgment Interest

"A plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right." United States Naval Inst. v. Charter Commc'ns., Inc., 936 F.2d 692, 698 (2d Cir. 1991) (citing New York Civil Practice Law and Rules ("C.P.L.R.") §§ 5001 and 5002 (McKinney 2010)).[7]  Section 5001(a) of the C.P.L.R. provides, in part, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . ." C.P.L.R. § 5001(a).  Section 5001(b) further provides that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed . . . ." C.P.L.R. § 5001(b).  However, when "damages were incurred at various times," interest shall be "computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date."  Id. In New York, the statutory rate for pre-judgment interest in a breach of contract action is nine percent per annum.  See C.P.L.R. § 5004.

Accordingly, Billion Tower is entitled to interest computed from the date each of the damages—the charge-backs or mark-down allowances—was incurred through the date of the entry of judgment.  Those amounts and the respective dates they were incurred are as follows: (1) $17,000 from March 19, 2008 (Ko Aff. ¶ 36 & Ex. 3 (Doc. 42)); (2) $22,000 from April 10, 2008 (id. ¶ 37 & Ex. 4); (3) $15,000 from February 26, 2008 (id. ¶ 38 & Ex. 5); (4) $20,000 from March 27, 2008 (id. ¶ 39 & Ex. 6); (4) $14,200 from February 25, 2008 (id. ¶ 40 & Ex. 7); and

---

[7] "In a diversity case, state law governs the award of prejudgment interest," so New York law applies here.  Schipani v. McLeod, 541 F.3d 158, 164 (2d Cir. 2008) (citing Baker v. Dorfman, 239 F.3d 415, 425 (2d Cir. 2000)).

(5) $23,307.50 from June 3, 2008 (id. ¶ 41 & Ex. 8).  Pre-judgment interest is to be calculated by the Clerk of the Court, for each of these periods, at a rate of nine percent per annum.

### D.   Attorney's Fees & Costs

Billion Tower next seeks $30,932.71 in attorney's fees and litigation costs pursuant to Rule 11 of the Federal Rules of Civil Procedure.  (Galligan Supp. Decl. ¶¶ 20-21, 29 (Doc. 48)); (Galligan Decl. ¶ 39 (Doc. 43)).  Without relying on any legal authority, it contends that it is entitled to these fees and costs because they are the direct result of MDCT "reneging on the [p]arties' settlement agreement . . . [and] would have been completely unnecessary if [MDCT] had simply honored its agreement . . . ." (Galligan Decl. ¶ 37 (Doc. 43)).  Billion Tower may not recover these fees and costs.

"Courts in the United States have historically applied the 'American Rule,' under which each party is to bear its own costs of litigation, unmitigated by any fee-shifting exceptions." Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 186 (2d Cir. 2008) (citing Alyeska Pipeline Servs. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975)).  Thus, absent a statutory obligation, an enforceable contractual obligation, or a situation involving "willful disobedience of a court order," litigants generally pay their own attorney's fees.  See Aleyska, 421 U.S. at 247, 258 (citation omitted).

As an initial matter, there are no such circumstances here.  The parties entered into a settlement agreement after a mediation that took place on November 6, 2008.  (Declaration of Brian P. Galligan in Support of Billion Tower's Motion for Default Judgment ("Galligan DJ Decl.") ¶ 10 (Doc. 32)).  A settlement agreement is a contract like any other.  Powell v.

22

Omnicom, 497 F.3d 124, 129 (2d Cir. 2007); Red Ball Interior Demolition Corp. v. Palmadessa, 173 F .3d 481, 484 (2d Cir. 1999); Bank of New York v. Amoco, 35 F.3d 643, 661 (2d Cir. 1994). Billion Tower does not, however, provide any evidence that the agreement included a term that obligated MDCT to pay Billion Tower's attorney's fees in the event of any proceeding relating to the settlement—such as an action to enforce the agreement. See e.g., Inner City Telecoms. Network, Inc. v. Sheridan Broad. Corp., No. 10 Civ. 3567 (LAP), 2010 WL 2835559, at *1 (S.D.N.Y. July 13, 2010) (discussing such a provision in promissory note parties executed in connection with settlement agreement). Moreover, a draft copy of the "Settlement Term Sheet" contains no such term. (See Ko Supp. Aff., Ex. F)). Nor did the Court incorporate the terms of the settlement into a court order. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381 (1994) (noting that where a court order "incorporat[es] the terms of [a] settlement agreement . . . , a breach of the agreement would be a violation of the order").

Billion Tower's contention that it is entitled to attorney's fees pursuant to Rule 11 is similarly unavailing. Rule 11(c)(1) of the Federal Rules of Civil Procedure provides, in part, that "if, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b)[8]

---

[8] Rule 11(b) provides as follows:

By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Attorney's fees may be such an appropriate sanction. Fed. R. Civ. P. 11(c)(2); see also Chambers v. NASCO, Inc., 501 U.S. 32, 43 n.8 (1991). Rule 11(c)(2) provides further that "[a] motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b) . . . ." The Supreme Court has made clear, moreover, "that the central purpose of Rule 11 is to deter baseless filings in district court and thus, consistent with the Rules Enabling Act's grant of authority, streamline the administration and procedure of the federal courts." Cooter & Gell v. Hartmax Corp., 496 U.S. 384, 394 (1991).

Billion Tower fails to satisfy Rule 11's requirements. Although Billion Tower contends that the Court should sanction MDCT for "reneging" on its settlement agreement with Billion Tower (Galligan Supp. Decl. ¶ 37 (Doc. 48)), it does not explain how this conduct constitutes a violation of Rule 11(b), a rule which applies "only to assertions contained in papers filed or submitted with the court." Fed. R. Civ. P. 11(b) Advisory Committee's notes on 1993 Amendment to Rule 11. Additionally, Billion Tower fails to satisfy the Rule's requirement that a party make a motion for sanctions under the Rule separately from any other motion, see Fed. R. Civ. P. 11(c)(2), and consequently fails to satisfy due process requirements. See Margo v. Weiss, 213 F.3d 55, 63 (2d Cir. 2000) ("'[D]ue process requires that courts provide notice and

---

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

24

opportunity to be heard before imposing any kind of sanctions.'" quoting Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 96 (2d Cir. 1997)).  Accordingly, Billion Tower is not entitled to an award of attorney's fees and litigation costs.

### E.    Injunctive Relief

Finally, Billion Tower requests that the Court issue a permanent injunction against MDCT to prevent it from "dump[ing]" the merchandise it was obligated to deliver to Billion Tower and "directing that MDCT immediately deliver to Billion Tower any clothing bearing Billion Tower's valuable brand names and protected trademarks, . . . ." (Galligan Supp. Decl. ¶¶ 18, 19 (Doc. 48)).

Under the Lanham Act, 15 U.S.C. § 1116, upon which Billion Tower presumably relies,[9] the standard for obtaining a permanent injunction in this Circuit remains unclear.  Compare Gayle Martz, Inc. v. Sherpa Pet Group, LLC, 651 F. Supp. 2d 72, 84 (S.D.N.Y. 2009) (discussing whether the standard enunciated by the Supreme Court in eBay, Inc. v. MercExchange, LLC, a 2006 patent infringement case, extends to trademark actions but declining to reach the issue), with New York City Triathlon, LLC v. NYC Triathlon Club, 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010) (concluding that eBay applies to trademark actions).  In eBay, the Supreme Court concluded that a plaintiff seeking a permanent injunction must establish that (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3)

---

[9] Billion Tower does not mention the Lanham Act in its submissions to the Court; however, the Lanham Act protects marks such as those at issue here.  See 15 U.S.C. § 1127 (defining "trademark" as including "any word, name, symbol, or device, or any combination thereof" used by a person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown").

considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) the public's interest would not be disserved by a permanent injunction. eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).  Pre-eBay, a plaintiff merely had to (1) succeed on the merits, (2) show an absence of an adequate remedy at law; and (3) establish irreparable harm if the relief is not granted.  Roach v. Morse, 440 F.3d 53, 56 (2d Cir. 2006).

Although the reasoning in New York City Triathlon is persuasive, the Court need not decide whether the standard enunciated by the Supreme Court in eBay applies here as Billion Tower fails to meet even the less stringent standard under pre-eBay authority.  Indeed, Billion Tower cites virtually no legal authority for the proposition that it is entitled to a permanent injunction; and the sole case that it does cite, Malletier v. Whenu.Com, Inc., No. 05 Civ. 1325 (LAK) (DFE), 2007 WL 257717, at *6 (S.D.N.Y. Jan. 26, 2007), contains no discussion of the permanent injunction standard at all.  In light of Billion Tower's failure to provide adequate legal authority to bolster its contention and because the factual record has not been sufficiently developed to warrant such relief, Billion Tower is not entitled to a permanent injunction.

## IV.    Conclusion

For the foregoing reasons, Billion Tower should be awarded $111,507.50 plus interest at a rate of nine percent per annum calculated as set forth in Part III.C supra.

## <u>PROCEDURES FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION</u>

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Lewis A. Kaplan, and to the undersigned, at 500 Pearl Street,

New York, New York 10007.  Any request for an extension of time to file objections must be

directed to Judge Kaplan.  If a party fails to file timely objections, that party will not be

permitted to raise any objections to this Report and Recommendation on appeal.  Thomas v. Arn,

474 U.S. 140 (1985). IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir.

1993); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993).

Dated: New York, New York
      December 10, 2010

JAMES L. COTT
United States Magistrate Judge

Copies are being sent by ECF to:

Andrew P. Schriever, Esq.
Brian Patrick Galligan, Esq.
Joshua E. Kimerling, Esq.

A copy is being sent by mail to:

Rick Tang, CEO
MDCT Corporation
2103 Santa Anita Avenue
South El Monte, CA 91733-3419


Hon. Lewis A. Kaplan

27